No. 24-1568

# United States Court of Appeals
# for the Fourth Circuit

**TERRANCE REEVES,**

*Plaintiff-Appellant*,

v.

**PETE HEGSETH, Secretary of Defense, *et al.*,**

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 1:23-cv-1149 (AJT/LRV)

**BRIEF OF DEFENDANTS-APPELLEES**

ERIK S. SIEBERT
United States Attorney

PETER B. BAUMHART
CAROYLN M. WESNOUSKY
Assistant United States Attorneys
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:   (703) 299-3738/3996
Fax:   (703) 299-3983

Date: March 14, 2025         *Attorneys for Defendants-Appellees*

## TABLE OF CONTENTS

Page,

INTRODUCTION ..................................................................................................1

STATEMENT OF JURISDICTION ....................................................................1

STATEMENT OF THE ISSUES .........................................................................2

STATEMENT OF THE CASE .............................................................................2

I.  FACTUAL BACKGROUND ........................................................................2

    A.  Plaintiff's Performance Issues ................................................................3

    B.  Alleged Incidents Underlying Plaintiff's Hostile Work
        Environment Claim .................................................................................6

    C.  Plaintiff's Mid-Point Review ...............................................................10

    D.  Plaintiff's Anti-Harassment Complaint and Subsequent
        Investigation ..........................................................................................11

    E.  Plaintiff's Performance Evaluation .....................................................13

    F.  Plaintiff's Removal from Federal Service ...........................................14

    G.  Plaintiff's EEO Complaint ...................................................................15

II.  DISTRICT COURT PROCEEDINGS ........................................................16

    A.  Plaintiff's Complaint and Defendants' Motion to Dismiss ...........16

    B.  Discovery and Defendants' Motion for Summary Judgment .......18

    C.  District Court's Summary Judgment Decision ...............................20

SUMMARY OF THE ARGUMENT ...................................................................22

STANDARD OF REVIEW .................................................................................23

ARGUMENT .........................................................................................................23

I.   THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION AND HOSTILE WORK ENVIRONMENT CLAIMS. ……………………………………………………………23

     A.   Summary Judgment on Plaintiff's Retaliation Claim Was Proper. ..........................................................................23

          1.   *Plaintiff Cannot Make Out a Prima Facie Claim of Retaliation.* ...................................................................24

          2.   *Plaintiff Cannot Show that Defendants' Legitimate, Non-Retaliatory Reasons Were Pretextual.* ......................................31

     B.   Summary Judgment on Plaintiff's Hostile Work Environment Claim Was Proper. ...........................................................34

          3.   *Plaintiff Cannot Make Out a Prima Facie Claim.* ...................34

          4.   *Plaintiff Cannot Show That Defendants' Legitimate, Non-Discriminatory Reasons Are Pretextual.* ..................................44

II.  THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFF'S DISCRETE-ACT DISCRIMINATION CLAIM. ................................................................46

     A.   Only Plaintiff's Evaluation and Removal Constitute Adverse Employment Actions. .........................................................47

     B.   Plaintiff Did Not Plead a Nexus Between Any Alleged Adverse Action and Racial Discrimination. ..................................................51

CONCLUSION ..................................................................55

## <u>TABLE OF AUTHORITIES</u>

Page(s)

CASES

*Babb v. Wilkie*,
589 U.S. 399 (2020) ..........................................................................48

*Abrams v. Dep't of Pub. Safety*,
764 F.3d 244 (2d Cir. 2014) ..............................................................33

*Adkins v. Fairfax Cnty. Sch. Bd.*,
2008 WL 2076654 (E.D. Va. May 15, 2008)....................................29

*Alberti v. Rector & Visitors of Univ. of Va.*,
65 F.4th 151 (4th Cir. 2023)..............................................................41

*Annett v. Univ. of Kan.*,
371 F.3d 1233 (10th Cir. 2004)..........................................................34

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..........................................................................51

*Bass v. E.I. DuPont de Nemours & Co.*,
324 F.3d 761 (4th Cir. 2003) .............................................................42

*Beiter v. Runyon*,
50 F. App'x 32 (2d Cir. 2002)............................................................29

*Bell v. Brockett*,
922 F.3d 502 (4th Cir. 2019) .............................................................43

*Bing v. Brivo Sys., LLC*,
959 F.3d 605 (4th Cir. 2020) .............................................................54

*Bonds v. Leavitt*,
629 F.3d 369 (4th Cir. 2011) .............................................................34

*Brinkley v. Harbour Rec. Club*,
180 F.3d 598 (4th Cir. 1999) .............................................................41

*Buchhagen v. ICF Int'l, Inc.*,
545 F. App'x 217 (4th Cir. 2013).......................................................38

*Buchhagen v. ICF Int'l, Inc.*,
   650 F. App'x 824 (4th Cir. 2016)..........................................................28

*Causey v. Balog*,
   162 F.3d 795 (4th Cir. 1998)......................................................... 43, 53

*Cavallo v. Star Enter.*,
   100 F.3d 1150 (4th Cir. 1996)..............................................................19

*Chacko v. Patuxent Inst.*,
   429 F.3d 505 (4th Cir. 2005)................................................................35

*Coleman v. Md. Ct. of Appeals*,
   626 F.3d 187 (4th Cir. 2010)......................................................... 23, 51

*Conyers v. Va. Hous. Dev. Auth.*,
   927 F. Supp. 2d 285 (E.D. Va. 2013)...................................................26

*Cosby v. S.C. Probation, Parole & Pardon Servs.*,
   93 F.4th 707 (4th Cir. 2024)............................................... 26, 43, 44

*Diamond v. Bea Maurer, Inc.*,
   128 F. App'x 968 (4th Cir. 2005)..........................................................41

*Dowe v. Total Action Against Poverty*,
   145 F.3d 653 (4th Cir. 1998)................................................................29

*Edmonson v. Potter*,
   118 F. App'x 726 (4th Cir. 2004)..........................................................47

*Feldman v. Law Enf't Assocs. Corp.*,
   752 F.3d 339 (4th Cir. 2014)................................................................28

*Francis v. Booz, Allen & Hamilton, Inc.*,
   452 F.3d 299 (4th Cir. 2006)................................................................28

*Gessous v. Fairview Prop. Invs., LLC*,
   828 F.3d 208 (4th Cir. 2016)................................................................35

*Gibson v. Geithner*,
   776 F.3d 536 (8th Cir. 2015)................................................................33

*Gogel v. Kia Motors Mfg. of Ga., Inc.*,
    967 F.3d 1121 (11th Cir. 2020) .......................................................................33

*Hansley v. DeJoy*,
    2024 WL 4947275 (4th Cir. Dec. 3, 2024) .......................................................48

*Hartsell v. Duplex Prods., Inc.*,
    123 F.3d 766 (4th Cir. 1997) ..................................................................... 34, 37

*Hawkins v. PepsiCo, Inc.*,
    203 F.3d 274 (4th Cir. 2000) ...........................................................................39

*Holloway v. Maryland*,
    32 F.4th 293 (4th Cir. 2022) ............................................................................38

*Hoyle v. Freightliner, LLC*,
    650 F.3d 321 (4th Cir. 2011) ...........................................................................47

*In re Whitley*,
    848 F.3d 205 (4th Cir. 2017) ...........................................................................23

*Israelitt v. Enter. Servs. LLC*,
    78 F.4th 647 (4th Cir. 2023) ............................................................................26

*James v. Booz-Allen & Hamilton, Inc.*,
    368 F.3d 371 (4th Cir. 2004) ..................................................................... 26, 49

*Jessup v. Barnes Grp., Inc.*,
    23 F.4th 360 (4th Cir. 2022) ............................................................................40

*Johnson v. Mechanics & Farmers Bank*,
    309 F. App'x 675 (4th Cir. 2009) .....................................................................41

*Jones v. UnitedHealth Grp., Inc.*,
    802 F. App'x 780 (4th Cir. 2020) .....................................................................33

*King v. Rumsfeld*,
    328 F.3d 145 (4th Cir. 2003) ...........................................................................33

*Laurent-Workman v. Wormuth*,
    54 F.4th 201 (4th Cir. 2022) ..................................................................... 27, 29

*Li v. Gonzales,*
405 F.3d 171 (4th Cir. 2005) ...................................................................39

*Lightner v. City of Wilmington,*
545 F.3d 260 (4th Cir. 2008) ..................................................................44

*Livingston v. Datex-Ohmeda, Inc.,*
2008 WL 7289608 (D. Md. May 7, 2008) .............................................27

*Lucas v. VHC Health,*
128 F.4th 213 (4th Cir. 2025) ....................................................... 51, 54

*Massaro v. Fairfax Cnty.,*
95 F.4th 895 (4th Cir. 2024) ......................................................... 30, 31

*Matias v. Elon Univ.,*
780 F. App'x 28 (4th Cir. 2019) ............................................................41

*McCleary-Evans v. Md. Dep't of Transp.,*
780 F.3d  (4th Cir. 2015) ......................................................................54

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792 (1973) .............................................................................23

*McIver v. Bridgestone Ams., Inc.,*
42 F.4th 398 (4th Cir. 2022) ........................................ 25, 35, 37, 42

*McKinney v. G4S Gov't Sols., Inc.,*
711 F. App'x 130 (4th Cir. 2017) .........................................................50

*McNeal v. Montgomery Cnty.,*
307 F. App'x 766 (4th Cir. 2009) .........................................................38

*Melendez v. Bd. of Educ. for Montgomery Cnty.,*
711 F. App'x 685 (4th Cir. 2017) .........................................................42

*Miller v. N.H. Dep't of Corr.,*
296 F.3d 18 (1st Cir. 2002) ..................................................................35

*Muldrow v. City of St. Louis,*
601 U.S. 346 (2024) .............................................................................47

*Mustafa v. Iancu*,
    313 F. Supp. 3d 684 (E.D. Va. 2018) ....................................................37

*Nat'l R.R. Pass. Corp. v. Morgan*,
    536 U.S. 101 (2002) ...........................................................................35

*Nnadozie v. ManorCare Health Servs., LLC*,
    792 F. App'x 260 (4th Cir. 2019) .........................................................39

*Parsons v. Wynne*,
    221 F. App'x 197 (4th Cir. 2007) .........................................................26

*Perkins v. Int'l Paper Co.*,
    936 F.3d 196 (4th Cir. 2019) ............................................ 26, 35, 37, 41

*Perry v. Clinton*,
    831 F. Supp. 2d 1 (D.D.C. 2011) .........................................................29

*Perry v. Kappos*,
    489 F. App'x 637 (4th Cir. 2012) .........................................................29

*Planadeball v. Wyndham Vacation Resorts, Inc.*,
    793 F.3d 169 (1st Cir. 2015) ...............................................................33

*Proud v. Stone*,
    945 F.2d 796 (4th Cir. 1991) ...............................................................41

*Rayyan v. Va. Dep't of Transp.*,
    719 F. App'x 198 (4th Cir. 2018) ................................................. 41, 42

*Roberts v. Glenn Indus. Grp., Inc.*,
    998 F.3d 111 (4th Cir. 2021) ........................................................ 24, 29

*Roberts v. St. Agnes Hosp.*,
    2015 WL 3932398 (D. Md. June 25, 2015) .........................................26

*Robinson v. Priority Auto. Huntersville, Inc.*,
    70 F.4th 776 (4th Cir. 2023) ......................................................... 35, 41

*Roesinger v. Pohanka of Salisbury, Inc.*,
    2024 WL 701776 (4th Cir. Feb. 21, 2024) ..........................................38

*Sadhegi v. Inova Health Sys.*,
  251 F. Supp. 3d 978 (E.D. Va. 2017)....................................................33

*Schulman v. Axis Surplus Ins. Co.*,
  90 F.4th 236 (4th Cir. 2024)..............................................................19

*Settle v. Baltimore Cnty.*,
  34 F. Supp. 2d 969 (D. Md. 1999)......................................................47

*Smith v. City of Jackson*,
  544 U.S. 228 (2005) .........................................................................49

*Spriggs v. Senior Servs. of Se. Va.*,
  2012 WL 1940761 (E.D. Va. May 29, 2012).......................................27

*Strong v. Univ. Healthcare Sys., L.L.C.*,
  482 F.3d 802 (5th Cir. 2007) .............................................................33

*Tabb v. Bd. of Educ. of Durham Pub. Schs.*,
  29 F.4th 148 (4th Cir. 2022)..............................................................54

*Tex. Dep't of Cmty. Affs. v. Burdine*,
  450 U.S. 248 (1981) .........................................................................31

*Tyndall v. Nat'l Educ. Ctrs., Inc.*,
  31 F.3d 209 (4th Cir. 1994)...............................................................41

*Valerino v. Holder*,
  2013 WL 12432290 (E.D. Va. Feb. 20, 2013) ....................................27

*Villa v. CavaMezze Grill, LLC*,
  858 F.3d 896 (4th Cir. 2017)..............................................................23

*Volochayev v. Sebelius*,
  513 F. App'x 348 (4th Cir. 2013).......................................................42

*Webster v. Johnson*,
  126 F. App'x 583 (4th Cir. 2005).......................................................25

*Wikimedia Found. v. Nat'l Sec. Agency*,
  857 F.3d 193 (4th Cir. 2017)..............................................................54

STATUTES

5 U.S.C. § 2302(a)(2)(A) ................................................................. 48, 49

28 U.S.C. § 1291 ..................................................................................1

28 U.S.C. § 1331 ..................................................................................1

42 U.S.C. § 2000e-2 ..........................................................................48

42 U.S.C. § 2000e-16(a) ............................................................... 48, 49

RULES

E.D. Va. L. Civ. R. 7(F)(1) ...............................................................18

Fed. R. App. P. 28(a)(8)(A) ..............................................................39

## INTRODUCTION

Plaintiff Terrance Reeves was removed from his position with the National Geospatial-Intelligence Agency ("NGA") during a two-year probationary period. The agency's reasons for removal were the untimeliness and poor quality of his work product and his abrasive interactions with members of his unit, which led to numerous complaints and two contractors leaving their jobs. All of this is well documented in the record. Nonetheless, Plaintiff insists that it was not his performance, but rather his race and protected activity that resulted in a negative performance review and his removal from federal service. He also claims that a handful of interactions with his supervisors created a hostile work environment.

The District Court correctly rejected Plaintiff's claims. Regarding retaliation and hostile work environment, the undisputed record evidence makes clear that Plaintiff cannot show a *prima facie* claim or that Defendants' legitimate, non-discriminatory reasons were pretextual. Nor did Plaintiff's complaint state a plausible claim of discrete-act race discrimination. This Court should affirm.

## STATEMENT OF JURISDICTION

The District Court had subject-matter jurisdiction over Plaintiff's Title VII claims pursuant to 28 U.S.C. § 1331. JA10–20. After the District Court entered summary judgment for Defendants, JA1014–1033, Plaintiff filed a timely notice of appeal, JA1034. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether the District Court correctly granted summary judgment on Plaintiff's retaliation and hostile work environment claims where the record evidence establishes that he can neither make out a *prima facie* claim nor show that Defendants' legitimate, non-discriminatory reasons are pretextual.

2.     Whether the District Court correctly dismissed Plaintiff's discrete-act race discrimination claim when Plaintiff's complaint explicitly alleged that his employer's actions were retaliatory and did not otherwise allege a plausible link to race discrimination.

## STATEMENT OF THE CASE

As explained more fully below, the District Court deemed Defendants' statement of undisputed facts to be largely admitted due to Plaintiff's non-compliance with local rules in filing his summary judgment opposition—a decision from which Plaintiff has not appealed. *See infra*, Section II.B.

### I.     FACTUAL BACKGROUND

In July 2019, Plaintiff, an African American male, began working in NGA's Mission Oversight and Compliance ("MOC") unit as the Chief Privacy Officer and Chief of the Privacy and Civil Liberties Division ("MOCP"). JA60–63, JA65, JA68–69, JA139–140. As with all NGA positions, Plaintiff's position had a two-year trial period during which he could "be terminated if NGA determine[d] that [his] work

performance or conduct demonstrate[d] that [he] lack[ed] qualification or fitness for continued employment." JA63. Plaintiff's first-level supervisor was Gregory Gondeck, MOC's Deputy Director, and his second-level supervisor was Kevin Cichetti, Director of MOC—both Caucasian males. JA68–69, JA225–226, JA259–260. Cichetti interviewed Plaintiff and supported his hiring, and Gondeck also signed off on hiring Plaintiff. JA114, JA230, JA265.

## A.    Plaintiff's Performance Issues

In September 2019, two months after Plaintiff started, Gondeck reached out to Jennifer Harris, Division Chief of Performance Management and Pay and Employee Relations, to discuss concerns about Plaintiff's performance. JA288, JA291, JA300–301. On Harris's advice, Gondeck met with LaToya Allen, a Branch Chief within Human Development ("HD"), in early October 2019 to obtain recommendations for managing and improving Plaintiff's performance. JA295–300, JA310.

Following those recommendations, Gondeck and Cichetti met with Plaintiff on October 10, 2019, to share concerns that Plaintiff "appear[ed] to be struggling to perform in his role." JA311; *see* JA77, JA333–337. The concerns included: (1) his team's work "product [wa]s neither timely nor of requisite quality"; (2) "many members of MOCP and others in MOC fe[lt] as though [Plaintiff] d[id] not respect their experiences or opinions and ha[d] been dismissive or condescending towards

3

them"; and (3) Plaintiff's attitude was "adversely affecting both substantive production and morale." JA334; *see* JA311. Gondeck and Cichetti specifically noted that Plaintiff might not be on track to meet his performance objectives and cautioned that they "need[ed] to see immediate significant improvement in the timeliness and quality of the work product and the manner in which [he] engage[d] with [his] teammates." JA335. Gondeck and Cichetti said they would "take a more direct role in the day-to-day taskings" of MOCP, asked Plaintiff to attend trainings and coaching, and provided Plaintiff with specific guidance on improving performance. JA335–337.

Despite the emphasis on performance, Plaintiff responded by stating his hope that the "conversation was to spark motivation and not to speak about a 90-day performance," *i.e.*, since his start date. JA340. Plaintiff asked Gondeck and Cichetti to "allow more than 90 days to turn around this type of program" but confirmed that his "first 90 days was not what [he] initially expected." JA340. Cichetti agreed that "a team does not gel overnight," JA339, but reiterated that he was "concerned [Plaintiff] [was] not meeting successful performance standards for some objectives and elements" and noted that the October 10 meeting was "to ensure we are on the same page with respect to performance expectations." JA348.[1]

---

[1] In late October 2019, Gondeck and Cichetti followed up with Plaintiff to ensure he was enrolled in the training courses they suggested, and they worked to get him off the waitlist for several courses. JA360–361, JA363–364.

On October 21, 2019, Gondeck and Cichetti again spoke with Plaintiff about his performance, noting concerns about his delays on projects and his lack of engagement with his team members. JA347; *see* JA313, JA232–234, JA269, JA357. Gondeck and Cichetti also informed Plaintiff that they would initiate an Ombudsman Facilitated Self-Assessment of MOCP and its workplace culture. JA269, JA314. The Ombudsman's resulting report on November 22, 2019, contained comments by MOCP personnel about Plaintiff that "confirm[ed] what [Gondeck and Cichetti] were hearing and seeing" regarding his performance and behavior. JA243; *see* JA318–319.

Members of Plaintiff's team raised concerns about his leadership, management style, and lack of subject-matter expertise to Gondeck and Cichetti through January and February 2020. JA367–369, JA373–376. And Plaintiff continued to have "performance issues on a daily to multiple per week" rate and was performing only at the "minimally successful level" through February 2020. JA381.

On April 22, 2020, Gondeck and Cichetti submitted a formal memorandum to Sherrie Boardley and Tania Andrews in HD, which was drafted by Gondeck and approved by Cichetti, outlining Plaintiff's deficient performance and recommending his removal. JA303–331. Gondeck submitted an addendum, approved by Cichetti, on July 16, 2020, documenting seven additional, intervening instances where Plaintiff failed to meet performance standards and reaffirming the request to remove

Plaintiff. JA383–389.

The other division chiefs that Gondeck and Cichetti supervised—Deborah Pyle and Shawn Otten—did not struggle to meet performance expectations. JA419–420, JA422–423. Pyle and Otten "regularly produced high-quality work products while meeting deadlines with minimal supervision," received "positive feedback" from their colleagues, wore professional attire in the workplace, and "engage[d] appropriately" with others. JA419–420, JA422–423.

## B. Alleged Incidents Underlying Plaintiff's Hostile Work Environment Claim

During Plaintiff's first week of work, he met with Gondeck and Cichetti to discuss the MOCP. JA139–140, JA397. According to Plaintiff, Gondeck and Cichetti told him to not to speak with two of his predecessors—Walter Clay, who is African American, and Nerissa Murray, whom Plaintiff describes as an "ethnic minority," though he has never met or even spoken to her—because Clay was "an aggressive individual" and Murray had filed an Equal Employment Opportunity ("EEO") case against Gondeck and Cichetti and "both feared it could have jeopardized their careers." JA397; *see* JA140–142. Plaintiff claims that Gondeck and Cichetti reminded him he was on probation and threatened to fire him if he ever filed an EEO complaint. JA397, JA141.[2]

---

[2] Gondeck and Cichetti deny many of Plaintiff's characterizations of events. *E.g.*, JA227–230, JA261–264, JA266–267. As is required in the summary judgment

In August 2019, Plaintiff attended a MOC offsite meeting with Gondeck, Cichetti, and various division chiefs and contractors. JA397. Cichetti and the contractors allegedly spoke negatively about the MOCP team's performance, but not about other divisions.[3] According to Plaintiff, the MOCP team "consisted of all ethnic minority employees," but the other teams "had only Caucasian employees." JA397. Plaintiff claims that, at this meeting, he asked Gondeck and Cichetti to "refrain from discussing the division's performance," JA402, and "mentioned that [they] were a new team" and "to allow [them] time to actually perform before making those statements," JA144.

A week after the offsite meeting, Plaintiff alleges Gondeck told him that "[he] didn't think [Plaintiff] would make it here at NGA"—apparently in reference to Plaintiff's wearing sneakers with his suit. JA395. Gondeck allegedly remarked that "grown ups don't wear sneakers" and that he "wouldn't have hired" Plaintiff had he seen him in sneakers. JA395.

In September 2019, after other MOC personnel were discussing guns they owned, Cichetti asked if Plaintiff wanted to see a photo of his new AR-15 rifle. JA147–148, JA266–267, JA398. Plaintiff agreed, and Cichetti showed him the

---

posture, however, Defendants present the facts in the light most favorable to Plaintiff.

[3] Plaintiff testified that the comments were that MOCP employees were "lazy," "incompetent," "had no clue what they did," and that "all they did was look at . . . a spreadsheet." JA143.

photo. JA266–267. Plaintiff testified that this incident "was not motivated by race." JA149. Plaintiff asserts that, in the same conversation, Cichetti shared a story from his youth where "a group of African American boys beat him up and left him for dead." JA398.[4] Plaintiff recalls that Cichetti said "he looked at people differently" afterward. JA148; *see also* JA398 (describing Cichetti saying that it "caused him to view African Americans differently").

In October 2019, Cichetti invited Plaintiff to a Halloween party at Cichetti's house. JA398. According to Plaintiff, Cichetti did not invite anyone else from the MOCP because he allegedly did not think they "would feel comfortable about white people drinking and dressing in drag," but Plaintiff might. JA398. Plaintiff attended the party. JA398.

In October 2019, Cichetti left a sticky note on Plaintiff's desk stating "Hot Mess Citation"; three months later, in January 2020, Cichetti left Plaintiff another note stating "All my pants are sassy." JA398–399, JA271. Cichetti intended these notes as "good natured" and part of the "friendly banter" within the office to "build comradery and to enjoy light moments" with teammates. JA271. He did not intend "for anyone to feel badly" and recalls giving others similar notes. JA271.

In November 2019, Cichetti and Gondeck expressed concern to Plaintiff about

---

[4] Cichetti attested that he told Plaintiff the attackers' race only after Plaintiff asked. JA266.

an incident where a contractor, Michael Bietsch, felt intimated by Plaintiff standing over him in a meeting. JA399. This feedback was provided within a larger discussion about Plaintiff's performance objectives and areas he needed to improve, including his relationship with team members. JA314–317.

On February 7, 2020, Gondeck and Cichetti spoke with Plaintiff about his unprofessional work attire, including his wearing sneakers into the office. JA231, JA236–237, JA265, JA395, JA399. Later that day, Cichetti emailed all MOC personnel reminding them of the NGA's dress code—in effect since February 2018—and providing clarifying guidance that "business or business causal" attire applied except on Fridays, when "causal" attire was permitted. JA272–273, JA236–237, JA413–417.

On February 10, 2020, Gondeck and Cichetti met with Plaintiff to inform him that a contractor, Zach Norkus, had given his two-week notice because he could no longer work with Plaintiff. JA241–242, JA275–276, JA326–327, JA399. They also discussed concerns that another contractor, Kathy McReynolds, had about Plaintiff's leadership before she left NGA in December 2019. JA241–242, JA275–276. During this conversation, Plaintiff "repeatedly interrupted and spoke over" Cichetti to the point where Gondeck "told [Plaintiff] to stop interrupting and listen." JA327; *see* JA243, JA276–277, JA 400 (Plaintiff "attempted to reply" during a "pause"). Plaintiff then "placed both hands on the table and rose out of his seat half way to a

standing position"—while staring at Gondeck in "an aggressive manner." JA277; *see* JA243. Plaintiff recalls that Gondeck started to yell at him and balled up his fists, JA400, then "banged . . . on the desk very hard," JA167. Plaintiff asked Cichetti if he could be excused from the meeting and immediately left. JA167.

After this meeting, Plaintiff claims he became "extremely fearful" of Gondeck. JA400. According to Plaintiff, the next day he reported the incident to the NGA's Diversity and Inclusion Office, complaining about Cichetti and Gondeck's "harassment and bullying treatment." JA400.[5]

## C.    Plaintiff's Mid-Point Review

On May 29, 2020, Gondeck attempted to hold Plaintiff's mid-point review on a conference call with Cichetti, consistent with previous difficult performance-management conversations. JA243–244, JA278, JA425–426. Plaintiff asked if both supervisors were attending other division chiefs' mid-point reviews. JA244. When Gondeck replied in the negative, Plaintiff expressed discomfort about being treated differently and asked for a neutral representative. JA244, JA87–88. Cichetti ultimately left the call, which continued without Gondeck providing Plaintiff's mid-

---

[5] In his deposition, Plaintiff testified that he complained about this incident to NGA's Anti-Harassment program, *see* JA120–121—which suggests this was the same complaint that he made on June 1, 2020, rather than a separate, earlier complaint. *See infra*, Section I.D; JA393 (listing only one complaint to NGA's Anti-Harassment program), JA474–475 (listing February 2020 incident), JA119 (testifying that his interrogatory responses contained full list of complaints he made).

point review. JA425–426.

On June 11, 2020, Gondeck held Plaintiff's mid-point review without Cichetti. JA428. Jennifer Harris, a neutral party from HD, attended the meeting. JA428; *see* JA248–250. Consistent with previous discussions, Gondeck told Plaintiff he was "not meeting fully successful performance standards on some . . . objectives and elements." JA430. Gondeck provided Plaintiff with specific examples of his failure to meet expectations and reiterated that Gondeck "remain[ed] committed to helping [Plaintiff] achieve a fully successful rating." JA432. Plaintiff responded by asking Gondeck for "a written plan" of how he was "to ensure success in [his] role." JA434. Gondeck provided Plaintiff with a detailed list of action items. JA439.

### D.    Plaintiff's Anti-Harassment Complaint and Subsequent Investigation

On May 29, 2020, Plaintiff emailed Cynthia Snyder and Stacey Dixon (NGA's then-Deputy Director) to complain that he had "been harassed since September 2019" by Gondeck and Cichetti and had been the subject of "racial undertone comments" for the previous ten months. JA444–445. This complaint followed a generic email from Cichetti the day before criticizing Plaintiff for missing a deadline. JA446.

On June 1, 2020, Plaintiff called NGA's Anti-Harassment hotline and spoke with Dennis McHawes, complaining that he was subject to a hostile work environment and felt "harassed and discriminated against." JA466. On June 12,

2020, Plaintiff emailed McHawes a list of ten alleged incidents of "racial micro-aggressions" involving Gondeck and Cichetti. JA468–486.

On July 10, 2020, Kimberly Thompson—the Director of HD—appointed Carlos Colon Rodriguez to conduct an official inquiry into Plaintiff's allegations. JA488–489, JA491–493, JA495–496, JA501–502. Rodriguez interviewed some twelve individuals, including Plaintiff's team members, Ms. Murray, other MOC division chiefs, Gondeck, Cichetti, and Plaintiff. JA515–527. Cichetti and Gondeck learned of Plaintiff's allegations during discussions with Rodriguez in July 2020. JA226–227, JA260.

On September 8, 2020, Rodriguez issued a report summarizing his investigation and conclusions. *See* JA515–527. He concluded there was no evidence to support Plaintiff's complaint that Gondeck and Cichetti harassed or discriminated against him. JA526. Although it appeared that the "level of joking" within the MOC made some individuals uncomfortable and "appeared to be inappropriate," JA526, Rodriguez clarified that the "teasing, offhand comments, or isolated incidents" in his report "did not reach[] a level that supported Mr. Reeves' allegation of a hostile work environment," JA529. In fact, Rodriguez concluded that *Plaintiff himself* had "performance and interpersonal relations issues that required . . . attention by the MOC leadership." JA526.

12

E.    **Plaintiff's Performance Evaluation**

On October 8, 2020, Gondeck and Cichetti finalized Plaintiff's year-end performance evaluation for the period of July 8, 2019, to September 30, 2020. JA532–544. Gondeck rated Plaintiff's overall performance as a "1.0" on a scale of 1 to 5—an "[u]nacceptable" rating. JA544. Gondeck stated that Plaintiff's "engagement style consistently created friction with his teammates and hindered mission execution throughout this performance period," and that Plaintiff "demonstrate[d] an inability or unwillingness to perform in accordance with the NGA Core Values, Excellence, Accountability, Respect, Teamwork, and Honesty." JA540. Despite receiving "written and verbal feedback, leadership training, and access to an NGA coach," Plaintiff "was either not able or willing to consistently apply the feedback, training, and coaching to make significant improvement to his behaviors and performance." JA540.

NGA had a three-phase process for seeking reconsideration of a performance evaluation that included informal reconsideration, formal reconsideration, and final reconsideration. JA560–563. Plaintiff utilized all three phases. JA610–685. On November 6, 2020, Gondeck issued his informal reconsideration decision, denying Plaintiff's requested changes. JA640–653. On December 1, 2020, Kari Stone—the PM PRA[6]—issued her decision on Plaintiff's formal reconsideration request.

---

[6] The PM PRA, or Performance Management Performance Review Authority,

13

JA661–674. Stone denied the requested changes except for one performance element, which she changed from a "1" (unacceptable) to a "3" (successful) rating, along with an updated narrative. JA664. On December 29, 2020, Deputy Associate Director David D. Briggs issued his decision on Plaintiff's final reconsideration request. JA682–685. Briggs changed two ratings from "unacceptable" to "minimally successful" and denied the rest of Plaintiff's requested changes. JA684–685. Plaintiff's overall rating remained a 1 ("unacceptable"). JA511.

## F.    Plaintiff's Removal from Federal Service

Although Gondeck and Cichetti had proposed Plaintiff's removal in April 2020, NGA paused all non-mission-essential functions during the COVID-19 pandemic, including adverse employment actions. JA510. When those functions resumed in July 2020, Rodriguez was investigating Plaintiff's Anti-Harassment complaint. JA510. Employee Relations thus paused Plaintiff's potential removal until after Rodriguez's investigation concluded in September 2020—at which point removal proceedings resumed. JA510. After independently reviewing the case, Employee Relations concurred in recommending Plaintiff's removal. JA689, JA702, JA707–708.

On December 7 and 11, 2020, the Personnel Evaluation Board ("PEB")[7] met

---

establishes consistency in performance ratings across supervisors within agency components. JA572, JA597–598.

[7] The PEB was chaired by Vietta Williams and included the following members: Art

14

to discuss Plaintiff's removal. JA510, JA689, JA702–705, JA707–708. The PEB recommended removal and sent the case to Thompson, the deciding official. JA510.

Thompson "reviewed all the documentation and concluded that the removal during trial period was warranted." JA510. Because Thompson knew of Plaintiff's Anti-Harassment complaint, she "wanted to ensure his situation had been considered fairly" and "carefully reviewed the examples provided by management about the [Plaintiff's] failure to meet expectations and applied a reasonable standard person to them." JA512; *see* JA500. Thompson "concluded that the expectations were reasonable" and that Plaintiff had not performed "to a reasonable level." JA52. On January 15, 2021, Thompson issued a letter informing Plaintiff that his employment with NGA would be terminated effective January 29, 2021. JA717–718.[8]

### G.    Plaintiff's EEO Complaint

Plaintiff contacted an EEO counselor on July 28, 2020, and filed an informal complaint on August 7, 2020. JA722–727, JA729–732. In late August 2020

---

Haubold (Director, Security and Installation Directorate), James Link (Assistant General Counsel), Jennifer Harris, Sherrie Boardley, and Brenda Brooks (all from Employee Relations), Kathy Wever (Career Services), Ray Syah (Office of the Inspector General), Martin Cox (Deputy Director, EEO Office), Scott Peterson (Acting Chief, Personnel Security Division), as well as MOC management—*i.e.*, Cichetti and Gondeck. JA702, JA704.

[8] In March 2021, Plaintiff began working at HP, Inc., a job to which he had applied in December 2020 and for which he accepted an offer in January 2021—*before* he was removed from NGA. JA204–205, JA407. In fact, Plaintiff had decided to leave NGA in November 2020, largely to be a caregiver for his mother, as he wanted a role with more telework flexibility. JA190–191.

(between August 26 and August 28), Gondeck and Cichetti spoke with an EEO investigator who informed them (separately) of an anonymous informal EEO complaint. JA226–227, JA260–261. Cichetti did not discuss "specific allegations or circumstances that would identify the individual who made the complaint." JA260. Gondeck, however, "assumed" that Plaintiff "had made the allegations" based on the nature of the EEO investigator's questions. JA226.

On October 5, 2020, Plaintiff filed a formal EEO complaint, attaching the same ten-incident memorandum submitted with his Anti-Harassment complaint. JA546–558. The EEO office notified Plaintiff that it had received his formal EEO complaint on October 23, 2020, JA734–736, and that his complaint was accepted for investigation on November 16, 2020, JA738–743.

Plaintiff amended his EEO complaint on November 24, 2020, and January 29, 2021, to include allegations regarding his performance evaluation and termination. JA745–750, JA752–757. Gondeck and Cichetti did not know that Plaintiff had filed a formal EEO complaint until January 21, 2021. JA419, JA422.

## II.    DISTRICT COURT PROCEEDINGS

### A.    Plaintiff's Complaint and Defendants' Motion to Dismiss

Plaintiff filed this action on July 13, 2023. JA10–28. After mistakenly filing in the U.S. District Court for the District of Columbia, Plaintiff successfully sought a transfer of venue to the U.S. District Court for the Eastern District of Virginia.

ECF No. 5, 6, *see* JA2–3.[9] The complaint asserted three claims under Title VII: (1) discrete-act race discrimination, (2) hostile work environment, and (3) retaliation. JA10–28.

Defendants moved to dismiss the complaint, arguing that Plaintiff failed to state any plausible claim for relief. JA29; ECF No. 20. On December 19, 2023, the District Court granted that motion in part, dismissing Plaintiff's discrete-act race discrimination claim. JA31–39. The court held that Plaintiff "failed to allege facts that plausibly allege any nexus between the alleged discrimination and any adverse employment actions." JA35. Specifically, Plaintiff expressly alleged that the two discrete adverse actions identified in the complaint—his performance evaluation and removal from federal service—"were in retaliation for his *EEOC reporting* activities, not based on his other allegations of racial animus." JA35 (citing JA18, ¶¶ 37, 39). Thus, because Plaintiff "affirmatively and exclusively allege[d]" that the relevant employment actions were retaliatory rather than racially discriminatory, he failed to state a discrimination claim. JA35. The Court denied Defendants' motion as to Plaintiff's other claims. JA35–39.

---

[9] "ECF No." refers to the docket number from the District Court's electronic docket for any filing not included in the Joint Appendix.

### B.    Discovery and Defendants' Motion for Summary Judgment

Plaintiff's two remaining claims proceeded to discovery. The parties exchanged written discovery—interrogatories and document requests—and all parties produced documents. Defendants also took Plaintiff's deposition. JA102–221. Plaintiff took no depositions.

Following the close of discovery, Defendants moved for summary judgment on April 8, 2024. JA54–55. Under the local rules, Plaintiff's opposition was due on April 22. *See* E.D. Va. L. Civ. R. 7(F)(1). Just after midnight on April 23, 2024, Plaintiff filed both an "opposition" to Defendants' motion and a supporting "memorandum of law," totaling approximately 50 pages combined. ECF Nos. 54, 55. Defendants notified Plaintiff that these untimely filings violated the local rules, which permit a single opposition filing of no more than 30 pages. *See* ECF No. 59. Later on April 23, Plaintiff sought leave to file a single opposition to Defendants' motion, albeit one that substantively altered his initial filing by attaching several new exhibits and revising the putative disputes of material fact. ECF No. 56; *see* ECF No. 59. Without receiving a ruling on the motion for leave, Plaintiff filed his revised "opposition" and supporting "memorandum of law," with exhibits. ECF Nos. 57, 58.

The next day, Defendants filed an opposition to the motion for leave, explaining that, although they consented to a *nunc pro tunc* extension of time for Plaintiff to combine his initial opposition and memorandum of law into a single brief

that complied with the local rules, Defendants opposed Plaintiff's belated attempt to substantively revise those filings. ECF No. 59.

On May 1, 2024, the District Court granted Plaintiff's motion for leave in part and denied it in part. ECF No. 63. Specifically, the Court granted Plaintiff leave to late-file his second brief in opposition to Defendants' motion (*i.e.*, ECF No. 58), including most of the attached exhibits; the Court denied leave as to the statement of material facts attached as an exhibit to that opposition "on the grounds that it exceeds the 30-page limit" set by the local rules. ECF No. 63 at 1. Accordingly, the Court would "deem admitted as uncontested the facts set forth in Defendants' memorandum in support of their motion for summary judgment, . . . except to the extent that a genuine issue of material fact otherwise appears from the face of the opposition brief and admitted exhibits." *Id.* at 1–2.[10]

The District Court held a hearing on Defendants' motion on May 8, 2024. JA1035–1056. At the conclusion of argument, the court took the matter under advisement. JA1055.

---

[10] Plaintiff does not challenge this ruling in his opening brief and has thus waived any such argument. *See Schulman v. Axis Surplus Ins. Co.*, 90 F.4th 236, 245 n.5 (4th Cir. 2024) ("A party waives an argument by failing to present it in its opening brief[.]" (citation omitted)); *Cavallo v. Star Enter.*, 100 F.3d 1150, 1152 n.2 (4th Cir. 1996) ("[A]n issue first argued in a reply brief is not properly before a court of appeals.").

### C.    District Court's Summary Judgment Decision

The District Court granted summary judgment on May 21, 2024. JA1014–1032. In a 19-page order, the court explained that the record evidence failed to create a triable issue as to retaliation or hostile work environment.

**1.**    Regarding retaliation, the District Court concluded, first, that Plaintiff did not engage in protected activity in August 2019 when, during the offsite meeting, he asked his supervisors not to speak about the MOCP team's performance. JA1024–1025. Because neither the allegedly critical comments nor Plaintiff's response included any reference to race or discrimination, "no one in Cichetti and Gondeck's position could reasonably believe that [Plaintiff's] request or demand to avoid 'talking about' the division's performance—of which Cichetti and Gondeck were the leaders—was a complaint about discrimination or hostility in the workplace." JA1025.

Nevertheless, the District Court "assum[ed]" that the evidence could support a *prima facie* retaliation claim based on temporal proximity between Gondeck's August 2020 surmise that Plaintiff filed an informal EEOC complaint against him, as well as the conclusion of the Anti-Harassment investigation, and Plaintiff's October 2020 performance review. JA1025–1026. Even so, the District Court held that Defendants carried their burden to articulate a legitimate, non-retaliatory reason for the performance review and Plaintiff's removal: Plaintiff's "poor performance,

including his issues with meeting deadlines and producing quality work," which "was documented throughout his short, probational tenure at the NGA, and by parties other than Gondeck and Cichetti." JA1026. At the final step of the applicable framework, Plaintiff had failed to adduce evidence that this reason was pretextual— his documented performance issues "long predated his engagement in any protected activity, thereby precluding any inference of pretext for any retaliation because of his protected activity," and there was otherwise "no evidence of any recognized basis upon which pretext can be reasonably inferred." JA1028. Accordingly, Defendants were entitled to summary judgment on Plaintiff's retaliation claim.

2.      As for hostile work environment, the District Court held that Plaintiff failed to make out a *prima facie* claim. Specifically, the court concluded that the incidents on which Plaintiff premised this claim—viewed in their totality and in the light most favorable to Plaintiff, assuming as true his version of events—were insufficient "to establish that he was subjected to conduct that was sufficiently pervasive and severe to constitute a hostile work environment":

> In that regard, no reasonable factfinder could . . . conclude that there was racially-motivated severe or pervasive conduct in [Plaintiff's] work environment based on (1) [his] *inclusion* at a Halloween party; (2) [Plaintiff's] performance feedback, in the form of both formal and informal communications concerning specific recommendations for how [he] could improve his performance; (3) advising [Plaintiff] of his dress code violations or sending out a communication to the entire MOC team reminding them of the dress code expectations; (4) a single incident when Gondeck "balled up his fists" during the meeting about

21

> performance issues; and (5) [Plaintiff] receiving one or more sticky notes commenting on his dress, even if it was in poor taste.

JA1031. Thus, Defendants were entitled to summary judgment on that claim, too.

This appeal followed. JA1034.

## SUMMARY OF THE ARGUMENT

The District Court correctly granted summary judgment on Plaintiff's retaliation and hostile work environment claims. Regarding retaliation, Plaintiff cannot make out a *prima facie* claim where his performance issues long predated any protected activity and there is no evidence showing that his protected activity caused his performance evaluation or removal. At the very least, there is no evidence of pretext to rebut Defendants' legitimate, non-retaliatory reasons for those actions. Likewise, the evidence did not establish that Plaintiff's work environment was severe or pervasive, or that the incidents he complains of were racially motivated, as required to make out a *prima facie* hostile work environment claim. And, as with his retaliation claim, Plaintiff adduces no evidence to rebut the legitimate, non-discriminatory reasons for those incidents.

The District Court also correctly dismissed Plaintiff's discrete-act discrimination claim. Plaintiff expressly alleged that the two actionable events—his performance evaluation and removal—were retaliatory rather than discriminatory, and his remaining allegations failed to draw the necessary connection between those events and his race.

22

## STANDARD OF REVIEW

This Court "review[s] a . . . decision to grant summary judgment de novo, applying the same legal standards as the district court, and viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 900 (4th Cir. 2017) (citation omitted). Likewise, the Court "review[s] de novo the grant of a motion to dismiss under Rule 12(b)(6)." *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).

## ARGUMENT

### I.   THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION AND HOSTILE WORK ENVIRONMENT CLAIMS.

Defendants were entitled to summary judgment on Plaintiff's retaliation and hostile work environment claims. As explained below, Plaintiff's claims failed on all aspects of the applicable framework.[11]

### A.   Summary Judgment on Plaintiff's Retaliation Claim Was Proper.

The District Court correctly granted summary judgment on Plaintiff's retaliation claim. Although the court assumed that Plaintiff could make out a *prima facie* case, the evidence in fact precludes such a showing, and this Court may affirm on that independent ground. *See In re Whitley*, 848 F.3d 205, 207 (4th Cir. 2017)

---

[11] Plaintiff acknowledges that the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–04 (1973), applies to his retaliation and hostile work environment claims. *See* Pl.'s Br. 15.

("[W]e can affirm on any legal ground supported by the record and are not limited to the grounds relied on by the district court." (citation omitted)). In any event, the District Court correctly concluded that Plaintiff cannot show that Defendants' non-retaliatory, performance-based reasons for Plaintiff's performance evaluation and removal were pretextual.

### 1. Plaintiff Cannot Make Out a Prima Facie Claim of Retaliation.

To make out a *prima facie* claim of retaliation under Title VII, Plaintiff must show that (1) "he 'engaged in protected activity,'" (2) "his employer 'took an adverse action against [him],'" and (3) "a causal relationship existed between the protected activity and the adverse employment activity." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021) (citations omitted). Here, there is no evidence that Plaintiff's protected activity under Title VII caused any legally cognizable employment action.

As a threshold matter, Plaintiff's first "protected activity" that Gondeck and Cichetti knew about occurred on June 1, 2020. JA69.[12] Citing no germane supporting authority, Plaintiff insists that his request at the August 2019 offsite meeting that

---

[12] Plaintiff testified that his June 1, 2020, Anti-Harassment complaint was his first "official" complaint against Gondeck and Cichetti. JA120–121. Plaintiff's declaration during the EEO phase refers to a February 2020 conversation with Cynthia Snyder about Gondeck's behavior, JA87, but there is no documentary evidence of this conversation and, most importantly, no evidence that Cichetti or Gondeck knew about it.

24

Cichetti and Gondeck not discuss the performance of his team was protected activity. Pl.'s Br. 19–21. As the District Court correctly held, this request could not reasonably be viewed as protected activity. Indeed, even *Plaintiff himself* did not identify this event as protected activity, during either the EEO phase or discovery in this litigation. *See* JA69, JA392–393, JA405–406. Most tellingly, nothing about the conversation at the offsite would have put Gondeck and Cichetti on "notice that [Plaintiff wa]s complaining about *discrimination* based on . . . protected status." *McIver v. Bridgestone Ams., Inc.*, 42 F.4th 398, 412 (4th Cir. 2022) (emphasis added). The uncontroverted evidence shows instead that the entire discussion was facially neutral—there was no mention of race (or any other protected status) by Cichetti, Gondeck, or Plaintiff. The only basis Plaintiff has ever identified for believing that the criticism was racially motivated is his subjective conclusion that Cichetti and Gondeck are not African American, while the people about whom they were speaking were. JA144.[13] But a court "cannot jump from the mere existence of criticism to the conclusion that the criticism was racially motivated." *Webster v. Johnson*, 126 F. App'x 583, 588 (4th Cir. 2005). Plaintiff's undisputed "fail[ure] to tie [his] complaint[ ] about workplace conduct to h[is] protected status" precludes

---

[13] Plaintiff's claim that his team was made up of minority individuals ignores the fact that several of contractors within MOCP whom he supervised were white. JA1053–1054. At the District Court hearing, Plaintiff's counsel conceded that Plaintiff supervised white contractors but claimed, without citing record evidence, that those contractors did not start until October 2019. JA1055.

establishing that his comments at the offsite were protected activity. *Cosby v. S.C. Probation, Parole & Pardon Servs.*, 93 F.4th 707, 721 n.17 (4th Cir. 2024) (citation omitted); *see Conyers v. Va. Hous. Dev. Auth.*, 927 F. Supp. 2d 285, 296 (E.D. Va. 2013) (plaintiff's "generalized grievance that did not reference race or sex in any way" was not protected activity), *aff'd*, 533 F. App'x 342 (4th Cir. 2013).

The only materially adverse actions after Plaintiff's June 2020 protected activity are his October 2020 performance evaluation and January 2021 removal. *See Perkins v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019) (recognizing that retaliation plaintiff must demonstrate that employer took a "materially adverse action" against him).[14] The remaining actions are non-actionable "[p]etty slights, minor annoyances, and simple lack of good manners," rather than the "significant harm" required to support a retaliation claim. *Israelitt v. Enter. Servs. LLC*, 78 F.4th 647, 656–57 (4th Cir. 2023) (citation omitted)); *see Roberts v. St. Agnes Hosp.*, 2015 WL 3932398, at *9 (D. Md. June 25, 2015) (plaintiff's "complaints of discriminatory monitoring" not materially adverse), *aff'd*, 622 F. App'x 255 (4th Cir. 2015);

---

[14] Although this Court has previously indicated that a performance evaluation is not materially adverse, *see Parsons v. Wynne*, 221 F. App'x 197, 198 (4th Cir. 2007), the Court has also stated, in the context of a discrimination claim, that such an evaluation may be actionable "where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment," *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004) (citation omitted). In an abundance of caution, Defendants assume for purposes of this appeal that Plaintiff's evaluation is a materially adverse action because there is evidence that Thompson considered it in her removal decision.

*Valerino v. Holder*, 2013 WL 12432290, at *13 (E.D. Va. Feb. 20, 2013) (criticism of plaintiff's "attire" not materially adverse), *aff'd*, 539 F. App'x 256 (4th Cir. 2013); *Spriggs v. Senior Servs. of Se. Va.*, 2012 WL 1940761, at *10 (E.D. Va. May 29, 2012) (plaintiff's claim she was "unsupported and out-of-her element in her new position" and supervisors did not "effectively communicate" not materially adverse), *aff'd*, 489 F. App'x 711 (4th Cir. 2012); *Livingston v. Datex-Ohmeda, Inc.*, 2008 WL 7289608, at *3 (D. Md. May 7, 2008) ("complaints that [plaintiff] was singled out and strictly monitored" not materially adverse), *aff'd sub nom. Livingston v. Gen. Elec. Co.*, 316 F. App'x 233 (4th Cir. 2009).

Beginning with Plaintiff's evaluation, although Gondeck and Cichetti signed the evaluation on October 8, 2020—a few days after Plaintiff submitted his formal EEO complaint—no inference of causation arises from the apparent temporal proximity, as Gondeck and Cichetti did not learn of the formal EEO complaint until January 21, 2021—long *after* finalizing the evaluation. JA419, JA422, JA532–544. The only protected activity of which Cichetti was aware at the time was the Anti-Harassment investigation from July 2020, almost three months earlier, JA260, which is too long a temporal lapse to infer causation, *e.g.*, *Laurent-Workman v. Wormuth*, 54 F.4th 201, 219 (4th Cir. 2022) (two-month gap). Gondeck also knew of this investigation, and he surmised (though he did not know) that Plaintiff had submitted

27

an informal EEO complaint based on a conversation with the EEO office in August 2020. JA226–227.

Importantly, however, although the District Court assumed that Gondeck's surmise could support a causal link to Plaintiff's performance evaluation, that evaluation simply formalized criticism of Plaintiff's performance that Gondeck and Cichetti had documented since late September 2019—before Plaintiff ever engaged in protected activity. *See, e.g.*, JA300–301. The possibility that Plaintiff might receive a low performance rating in fact "was contemplated" no later than October 10, 2019—"before the protected activity occurred." *Buchhagen v. ICF Int'l, Inc.*, 650 F. App'x 824, 830 (4th Cir. 2016) (affirming summary judgment); *see* JA334. Where "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted). Here, because the alleged "acrimony began . . . months before [Plaintiff's] first [protected] activity," the evidence does not support an inference of retaliation. *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 349 (4th Cir. 2014).[15]

---

[15] The District Court also appeared to believe a temporal link could be drawn between the September 2020 conclusion of the Anti-Harassment investigation and the October 8, 2020 finalization of Plaintiff's evaluation. JA1026. But even Plaintiff himself never made this argument, perhaps because the record evidence makes clear that Cichetti and Gondeck did not learn the result of the investigation until October 23, 2020—more than two weeks *after* they finalized Plaintiff's evaluation. JA261; *see* JA227.

The evidence similarly fails to support any inference of causation regarding Plaintiff's removal—a decision made by Kimberly Thompson, rather than Gondeck or Cichetti. JA509–510, JA717–718.[16] The evidence is uncontroverted that at the time of her decision, Thompson knew only of Plaintiff's protected activity from May through July 2020—six months earlier. JA500. She could not have removed Plaintiff as retaliation for his EEO complaint, since she was not aware of it at the time. *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998) ("[B]y definition, an employer cannot take action because of a factor of which it is unaware[.]"). And the six-month gap between Plaintiff's activity in the summer of 2020 and Thompson's January 2021 decision to remove him is too long to infer causation. *See id.* ("A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two."). Indeed, this Court has routinely held that even a two- or three-month lapse is too long to establish a causal connection by temporal proximity. *Laurent-Workman*, 54 F.4th at 219; *Roberts*, 998 F.3d at 127; *see Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012); *Adkins v. Fairfax Cnty.*

---

[16] That Plaintiff never engaged in protected activity concerning Thompson undercuts any inference that her decision to remove him was retaliatory. *See, e.g.*, *Beiter v. Runyon*, 50 F. App'x 32, 36 (2d Cir. 2002); *Perry v. Clinton*, 831 F. Supp. 2d 1, 24 (D.D.C. 2011).

*Sch. Bd.*, 2008 WL 2076654, at *6 (E.D. Va. May 15, 2008) (collecting cases), *aff'd*, 297 F. App'x 202 (4th Cir. 2008).

Any causal inference is further weakened by the fact that independent actors reviewed and supported both actions—with no evidence that they knew of Plaintiff's protected activity. JA702–704. As this Court recently held, a plaintiff fails to make out "the causation element of the *prima facie* case" where "multiple layers of authority independently" reached the same conclusion as the allegedly responsible management official. *Massaro v. Fairfax Cnty.*, 95 F.4th 895, 903–04 (4th Cir. 2024). In *Massaro*, the plaintiff was transferred to a different position, allegedly as retaliation for a discrimination complaint he submitted against his supervisor. Although that supervisor was the ultimate decision-maker regarding the transfer, this Court nonetheless held that the plaintiff could not establish the causation element of a *prima facie* case where, before reaching the decision-maker, his "appeal went through four stages . . . , and the majority of those who reviewed the evidence recommended that [the plaintiff] be disciplined, without having had any prior contact with [the supervisor] about [the plaintiff]." *Id.* at 903.

Here, Plaintiff sought reconsideration of his performance evaluation from two independent actors—Kari Stone and David Briggs—for whom there is no evidence of knowledge of Plaintiff's protected activity, and who both concurred with Plaintiff's overall unsuccessful rating. JA655–659, JA661–674, JA676–680,

JA682–685, JA700–701. Likewise, although Gondeck and Cichetti proposed Plaintiff's removal, that proposal was then considered by Employee Relations, the PEB, and Kimberly Thompson, for many of whom there is no evidence of knowledge of Plaintiff's protected activity, and all recommended removal. JA510, JA702, JA704, JA707–708. And even though Thompson knew of some of Plaintiff's protected activity—albeit against other people—the same was true of the decisionmaker in *Massaro*, who was *the same supervisor* against whom that plaintiff had previously made a complaint. 95 F.4th at 898.

> ### 2. Plaintiff Cannot Show that Defendants' Legitimate, Non-Retaliatory Reasons Were Pretextual.

Even if Plaintiff could show a *prima facie* retaliation claim (he cannot), Defendants would still be entitled to summary judgment. The District Court correctly held that the evidence establishes legitimate, non-retaliatory reasons for the performance evaluation and the removal at the second *McDonnell-Douglas* step,[17] and Plaintiff cannot show that those reasons are pretextual.

Concerning the evaluation, the record is replete with Gondeck's and Cichetti's criticism of Plaintiff's performance. From October 2019 onward, both supervisors repeatedly counseled Plaintiff regarding several aspects of his job, from meeting deadlines to turning in quality work product to treating team members respectfully.

---

[17] At this step, Defendants bear only a burden of production, not of persuasion. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254–56 (1981).

JA303–331, JA333–337, JA339–341, JA343–351, JA383–389, JA430–432, JA439–440. Those same shortcomings—which, again, Gondeck and Cichetti began identifying before Plaintiff engaged in protected activity—formed the basis for the unsuccessful performance evaluation. *See* JA252–253, JA281–282, JA303–331, JA383–389.[18]

The evidence similarly shows that Thompson based her removal decision on the same performance deficiencies. JA510. Those deficiencies formed the basis of Gondeck's multiple memoranda recommending Plaintiff's removal, in which Cichetti concurred. JA303–331, JA383–389. Gondeck and Cichetti continued to articulate those same shortcomings at the PEB, which also recommended Plaintiff's removal (as did Employee Relations). *See* JA510, JA702, JA707–708, JA710–714. And Thompson expressly based her decision on the supporting documentation regarding Plaintiff's performance, as well as Plaintiff's performance evaluation (including the outcome of the reconsideration process), noting that the identified deficiencies put NGA "at risk of not meeting . . . legal requirements regarding protection of privacy." JA510–512.

For both actions, a failure to "meet[] . . . job performance expectations" is a legitimate, non-retaliatory reason at step two of *McDonnell-Douglas*, and Plaintiff

---

[18] Relying again on the August 2019 offsite, Plaintiff argues that his protected activity pre-dates any performance concerns. Pl.'s Br. 22–23. For the reasons already discussed, Plaintiff is mistaken. *See supra*, pp. 24–26.

does not argue otherwise. *King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003); *see Sadhegi v. Inova Health Sys.*, 251 F. Supp. 3d 978, 992 (E.D. Va. 2017) ("Title VII 'was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work.'" (citation omitted)), *aff'd*, 711 F. App'x 174 (4th Cir. 2018). And Plaintiff cannot show that this legitimate, non-retaliatory reason was pretextual as concerns either his evaluation or his removal. On the contrary, the fact that independent actors reviewed and supported both actions—with no evidence that they were aware of Plaintiff's protected activity—underscores that Plaintiff cannot carry his burden at step three of *McDonnell-Douglas*. *See supra*, Section I.A.1.

Plaintiff's only attempt to show pretext regarding the performance evaluation and removal is to argue that they occurred close in time to his protected activity. Pl.'s Br. 22–23. Again, however, he cites no supporting legal authority, and for good reason—although temporal proximity may be a basis for inferring retaliatory animus at step one of *McDonnell Douglas*, "temporal proximity, without more, does not support a finding of pretext" at step three. *Jones v. UnitedHealth Grp., Inc.*, 802 F. App'x 780, 783 (4th Cir. 2020); *accord, e.g.*, *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1137 n.15 (11th Cir. 2020) (en banc); *Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 179 (1st Cir. 2015); *Gibson v. Geithner*, 776 F.3d 536, 540 (8th Cir. 2015); *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254–55 (2d Cir. 2014); *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 807–08

(5th Cir. 2007); *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1240 (10th Cir. 2004). The

District Court therefore correctly granted summary judgment on Plaintiff's

retaliation claim.

**B.** **Summary Judgment on Plaintiff's Hostile Work Environment Claim Was Proper.**

The District Court also correctly granted summary judgment on Plaintiff's

hostile work environment claim. As the court held, Plaintiff cannot make out a *prima*

*facie* claim. Even if he could, the evidence shows that the challenged actions were

done for non-discriminatory reasons, which Plaintiff cannot show are pretextual.

*1.* *Plaintiff Cannot Make Out a Prima Facie Claim.*

A *prima facie* hostile work environment claim requires showing "that the

offending conduct (1) was unwelcome, (2) was because of . . . race, (3) was

sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment

and create an abusive work environment, and (4) was imputable to h[is] employer."

*Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011) (alteration omitted) (citation

omitted). Here, Plaintiff cannot show that the alleged conduct was severe or

pervasive, or that it occurred because of his race.

Title VII is not a "federal guarantee of refinement and sophistication in the

workplace," but rather "prohibits only harassing behavior that is so severe or

pervasive as to render the workplace objectively hostile or abusive." *Hartsell v.*

*Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997). Thus, "[a] hostile work

environment exists only when the workplace is so permeated with discriminatory intimidation, ridicule, and insult, that it would reasonably be perceived, and is perceived, as hostile or abusive." *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 781 (4th Cir. 2023) (cleaned up) (citation omitted). "[T]he ultimate inquiry is whether the conduct is so 'extreme' that it 'amount[s] to a change in the terms and conditions of employment,'" *McIver*, 42 F.4th at 408 (citation omitted), a test that this Court has described as "a high bar," *Perkins*, 936 F.3d at 208 (citation omitted).

**a.** To start, it is not clear that Plaintiff's performance evaluation and his removal—which are discrete employment actions—are properly considered part of his hostile work environment claim. *See Chacko v. Patuxent Inst.*, 429 F.3d 505, 511 n.2 (4th Cir. 2005) ("[D]iscrete acts of discrimination . . . . are clearly not allegations of a hostile work environment."); *see also Nat'l R.R. Pass. Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (describing "termination" as a "[d]iscrete act[]"); *Miller v. N.H. Dep't of Corr.*, 296 F.3d 18, 22 (1st Cir. 2002) ("performance evaluation" is "discrete act"). *But see Gessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 223 (4th Cir. 2016).  Further, Plaintiff himself alleged that those actions were retaliatory rather than discriminatory—an assertion that he maintained during his deposition. *See* JA18, JA177, JA193–194. But even if the Court were to consider the evaluation

35

and removal as part of his hostile work environment claim, summary judgment was still appropriate.

Other than his evaluation and removal, Plaintiff's hostile work environment claim comprises the following: (1) the July 2019 meeting where Plaintiff was told not to contact his predecessors; (2) the criticism of his team at the August 2019 offsite; (3) Gondeck's August 2019 comments regarding Plaintiff's sneakers; (4) the September 2019 meeting with Cichetti involving the picture of his AR-15 and anecdotal stories; (5) the October 2019 meeting where Gondeck and Cichetti told Plaintiff he was "not meeting [his] performance objectives"; (6) the October 2019 Halloween party; (7) the sticky notes in late 2019 and early 2020 stating "Hot Mess Citation" and "All my pants are sassy"; (8) the November 2019 meeting with Gondeck and Cichetti regarding Bietsch's complaint; (9) the February 2020 meeting with Gondeck and Cichetti about a contractor's two weeks' notice because of Plaintiff;[19] (10) the February 2020 meeting with Gondeck and Cichetti, and follow-on email, regarding the dress code;[20] and (11) the May 2020 telephonic mid-point review. JA396–400.

---

[19] The District Court did not "fail[] to consider" the November 2019 meeting or the one in February 2020, as Plaintiff contends. Pl.'s Br. 29; *see* JA1026–1027, JA1030–1031. Additionally, the comments critical of Plaintiff that he claims were racial stereotypes were not made "by Mr Gondeck and Mr. Cichetti," Pl.'s Br. 29, but were instead complaints that they had received about Plaintiff from contractors.

[20] As explained above, *supra*, p. 9, Plaintiff's insistence that this was a "new dress code" is simply not accurate, Pl.'s Br. 6–7, 27. Even if it were, it was applied

Even considered in combination, these incidents do not come close to the "high bar" of severe or pervasive conduct. *Perkins*, 936 F.3d at 208 (citation omitted). To start, the alleged offending conduct was infrequent and thus not pervasive—a series of "isolated or scattered incidents," which "is not pervasive enough to state a claim for hostile work environment." *Mustafa v. Iancu*, 313 F. Supp. 3d 684, 695 (E.D. Va. 2018). The alleged incidents are far less concentrated than conduct that this Court has previously found insufficient to establish a hostile work environment. *E.g.*, *Hartsell*, 123 F.3d at 768–69, 773–74 (rejecting claim premised on numerous incidents over less than three months). Plaintiff's claim here alleges fewer than a dozen incidents over eighteen months. Further, most of those occurred in 2019 and early 2020, and there is no evidence of additional claimed harassment after May 2020—eight months before Plaintiff was removed. Such "large temporal gaps between allegations undermine a hostile-work-environment claim." *McIver*, 42 F.4th at 408. When, as here, "allegations 'are remote in time relative to each other' and to the adverse employment action, the 'evidence does not create a genuine issue of material fact' that the conduct is pervasive enough." *Id.* (quoting *Perkins*, 936 F.3d at 210).

---

evenhandedly—Plaintiff admits that Cichetti's email went to the whole unit. *See id.* at 7; JA413–417. And Gondeck and Cichetti did not meet with the other division chiefs about the dress code because Plaintiff was the only one who wore sneakers in the office. JA161.

Nor was the conduct sufficiently severe. Indeed, the evidence in this case makes clear that that conduct is exactly the sort that this Court has found not to be severe or pervasive as a matter of law. *See, e.g.*, *Holloway v. Maryland*, 32 F.4th 293, 301 (4th Cir. 2022) (holding workplace conduct not severe or pervasive where, *inter alia*, plaintiff's "leadership and budget management" were "criticized . . . in meetings," supervisor "yelled at [plaintiff], slammed documents onto a table, and required [plaintiff] to address him as 'sir,'" and supervisor "required [plaintiff] to sign a disciplinary evaluation or else be considered insubordinate"); *Roesinger v. Pohanka of Salisbury, Inc.*, 2024 WL 701776, at *3 (4th Cir. Feb. 21, 2024) ("[A] boss who plays favorites and criticizes one's work, colleagues who give the cold shoulder, and 'the sporadic use of abusive language' are 'ordinary tribulations of the workplace' that . . . do not implicate Title VII." (citation omitted)); *Buchhagen v. ICF Int'l, Inc.*, 545 F. App'x 217, 219–20 (4th Cir. 2013) (supervisor "'mockingly' yell[ed] at [Plaintiff] in one meeting," "yell[ed] and pound[ed] her hands on her desk during another meeting," "'repeatedly harp[ed]' on a mistake made by [Plaintiff]," made "'snide comments' to [Plaintiff]," "play[ed] favorites with employees and pitt[ed] employees against each other," and "unfairly scrutinize[ed] and criticiz[ed] [plaintiff's] . . . compliance with . . . directives"); *McNeal v. Montgomery Cnty.*, 307 F. App'x 766, 776 (4th Cir. 2009) (supervisor's "comments about [plaintiff's] race and appearance, combined with her scrutiny of his sick leave and accusations of

theft" not severe or pervasive). The alleged incidents are instead the kind of "difference of opinion and personality conflict[s] with [one's] supervisor[s]" that this Court has "refuse[d] to transmute . . . into actionable race discrimination." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000); *see Nnadozie v. ManorCare Health Servs., LLC*, 792 F. App'x 260, 263 (4th Cir. 2019) ("The standard for proving an abusive work environment is . . . a high one because it is designed to 'filter out complaints attacking the ordinary tribulations of the workplace' and 'to ensure that Title VII does not become a general civility code.'" (citation omitted)).

Plaintiff's rejoinder is to recapitulate his allegations and proclaim, without supporting authority beyond the general standard for a hostile work environment claim, that such events are "sufficiently pervasive and severe" to make out a claim. Pl.'s Br. 25–29. This assertion, such as it is, does not comply with Plaintiff's obligation to include "citations to the authorities" supporting his argument. Fed. R. App. P. 28(a)(8)(A). Because "this section of [Plaintiff]'s brief contains no citation to legal authority," he has "forfeited the argument." *Li v. Gonzales*, 405 F.3d 171, 175 n.4 (4th Cir. 2005). At the very least, he has failed to provide any legal basis for reversing the District Court's summary judgment decision on this point.

**b.** Plaintiff also cannot show that the alleged conduct occurred because of his race, a separate element of a *prima facie* claim.

39

Plaintiff has identified three alleged comments, all by Cichetti, that made reference to race: (1) during the July 2019 meeting, Cichetti allegedly acknowledged that Walter Clay was African American (though he did not make reference to Plaintiff's race); (2) when inviting Plaintiff to the Halloween party in October 2019, Cichetti allegedly made a comment to the effect that other members of Plaintiff's team might not be comfortable with white people dressing in drag; and (3) in the September 2019 meeting, Cichetti told a story about being attacked by a group of boys which, he allegedly said, caused him to view African Americans differently. JA394–395.[21] Any inference that these comments suggest racial animus on Cichetti's part, however, is undercut by the uncontroverted evidence that Cichetti not only interviewed Plaintiff but also approved his hiring—he was the hiring manager for Plaintiff's position. JA265. There is a "strong inference of nondiscrimination" when the alleged discriminating official is the same person

---

[21] Cichetti denies ever saying that this event caused him to view African Americans differently, JA267, and Plaintiff himself testified that Cichetti said the event caused him to "look[] at *people* differently," JA148 (emphasis added); Pl.'s Br. 25. Although Plaintiff later testified differently—that Cichetti allegedly said the incident "caused him to view African Americans differently," JA398—it is well established that "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct," *Jessup v. Barnes Grp., Inc.*, 23 F.4th 360, 367 (4th Cir. 2022) (citation omitted). Plaintiff's attempt to cast this obviously significant discrepancy as mere "nuance[]" is unpersuasive. Pl.'s Br. 25–26. But even if the Court relied on Plaintiff's revised testimony, summary judgment still would be appropriate as explained below.

involved in the plaintiff's hiring. *Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209, 215 (4th Cir. 1994); *see Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991).

In any event, these "stray" and "isolated remark[s]," which were confined to the first three months of Plaintiff's almost two-year employment, cannot support a finding of racial animus as a matter of law. *Rayyan v. Va. Dep't of Transp.*, 719 F. App'x 198, 202 (4th Cir. 2018); *see Perkins*, 936 F.3d at 208 ("The mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." (internal quotation marks and citation omitted)). On their face, these statements were neutral or, at most, "ambiguous." *See, e.g., Johnson v. Mechanics & Farmers Bank*, 309 F. App'x 675, 681 (4th Cir. 2009); *Diamond v. Bea Maurer, Inc.*, 128 F. App'x 968, 972 (4th Cir. 2005). By contrast, this Court has found even comments directly *critical* of a plaintiff's protected characteristic insufficient to establish discriminatory animus. *See, e.g., Robinson*, 70 F.4th at 783 (affirming summary judgment despite co-worker's comment that employees should "come over to the white side"); *Alberti v. Rector & Visitors of Univ. of Va.*, 65 F.4th 151, 153–54, 156 n.5 (4th Cir. 2023) (plaintiff's supervisor made several comments critical of plaintiff's Swiss heritage); *Brinkley v. Harbour Rec. Club*, 180 F.3d 598, 608 (4th Cir. 1999) (co-worker stated "that he could not work for a woman"), *abrogated in other part by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003); *see also Matias v.*

41

*Elon Univ.*, 780 F. App'x 28, 30 (4th Cir. 2019) (supervisor told plaintiff that "[y]ou guys, Mexicans, you want everything. You just want money" and "[t]he only thing you know how to do is make tacos"); *Rayyan*, 719 F. App'x at 202 (affirming summary judgment where plaintiff's supervisor "made repeated comments to him that [plaintiff] was 'dumb' or 'stupid' while referring to the fact he was 'Arab' and from the 'middle east,'" and also stated "[t]his behavior may be okay in your country . . . but this is not how it's done here in America"); *Melendez v. Bd. of Educ. for Montgomery Cnty.*, 711 F. App'x 685, 689 (4th Cir. 2017) (supervisor told plaintiff "he did not want women working in the morning"); *Volochayev v. Sebelius*, 513 F. App'x 348, 351–52 (4th Cir. 2013) (plaintiff's supervisors called Russians "rude, insubordinate, and overly fond of vodka"). Even viewed in the light most favorable to Plaintiff, therefore, Cichetti's alleged comments do not establish discriminatory animus as a matter of law.

Plaintiff's remaining evidence is insufficient to carry his burden as well. To start, there is no evidence directly indicating that the alleged incidents "have anything to do with . . . race." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). Indeed, other than the comments by Cichetti just discussed, all the conduct was "neutral" on its face. *McIver*, 42 F.4th at 409.[22] There is no

---

[22] Plaintiff asserts the "Hot Mess Citation" and "All my pants are sassy" note were "racially charged urban colloquialisms." Pl.'s Br. 28. Tellingly, he cites no record evidence for this contention—because there is none. Plaintiff never made this claim

evidence, for instance, that anyone "made any derogatory comments about [Plaintiff]'s race." *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998). Instead, Plaintiff relies on circumstantial evidence, such as comparators, to support his claim. When relying on comparators, a plaintiff must "provide evidence that the proposed comparators are not just similar in *some* respects, but 'similarly-situated *in all respects.*'" *Cosby*, 93 F.4th at 714 (citation omitted). "To that end, the plaintiff must prove that []he and the comparator 'dealt with the same supervisor, were subject to the same standards[,] and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id.* (citation omitted).

Here, although Plaintiff's putative comparators—Shawn Otten and Deborah Pyle—had the same supervisors (*i.e.*, Gondeck and Cichetti) and were also division chiefs, neither had the same performance issues as Plaintiff. JA419–420, JA422–423. For example, both received "Excellent" performance evaluation ratings, adhered to professional work attire, and got along well with colleagues and

---

in his discovery responses or at his deposition. In fact, he testified that the problem with the notes was that they suggested he was "feminine." JA157. He also argues, for the first time on appeal, that Gondeck's criticism of his sneakers was based on a racial stereotype. Pl.'s Br. 27–28. But this assertion is similarly unsupported by any evidence, and it is also waived because Plaintiff never raised it in his summary judgment brief or at the hearing. *See Bell v. Brockett*, 922 F.3d 502, 513 (4th Cir. 2019) ("Appellants may not raise arguments on appeal that were not first presented below to the district court.").

contractors. *See* JA419–420, JA422–423; *see* JA161 (Plaintiff's supervisees and contractors were the only other people who wore sneakers in the office). Thus, because Plaintiff cannot show that Otten and Pyle "'engaged in the same conduct' as [him], they cannot serve as valid comparators." *Cosby*, 93 F.4th at 715 (citation omitted); *see Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008) ("The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful.").

> 2. *Plaintiff Cannot Show That Defendants' Legitimate, Non-Discriminatory Reasons Are Pretextual.*

Plaintiff's claim fails for the additional reason that there are non-discriminatory reasons for the conduct he challenges, and he cannot show that those reasons are pretextual. Most prominently, the concerns about Plaintiff's performance and how it affected his team are documented throughout the record. *See supra*, Part I.A.2; *see also* JA303–331, JA383–389. The record is also clear that Gondeck and Cichetti tried several ways, including a coach and additional training, to help Plaintiff improve his performance. JA333–337, JA360–364. These are legitimate, non-discriminatory reasons for criticizing Plaintiff's performance and subjecting him to closer supervision.

Similarly, Cichetti attempted to sit in on Plaintiff's May 2020 telephonic mid-point consistent with prior practice for handling difficult performance-management discussions—something he had cleared with NGA's Office of General Counsel in

advance. JA244–245, JA277–279. Plaintiff nonetheless objected to Cichetti's participation, prompting Cichetti to leave the call, and the mid-point review was completed on June 11, 2020, with a neutral third party present. JA245–246.

Several other incidents concern Plaintiff's office attire. Both Cichetti and Gondeck spoke with Plaintiff on multiple occasions about the importance of professional attire, particularly with respect to Plaintiff's admitted practice of wearing sneakers in the office. JA161–162, JA230, JA237, JA272, JA399. Cichetti's February 2020 email about the dress code was sent to the whole office and clarified guidance for the existing policy; it was not a new policy, nor was it directed only at Plaintiff. JA236–237, JA272–273, JA413–417. The "Hot Mess Citation" and "All my pants are sassy" note, on the other hand, were meant to be light moments of office banter, and Plaintiff was not the only person to receive a similar note. JA236–237, JA271–273.

Regarding the July 2019 meeting, Cichetti advised against contacting Clay and Murray because he thought such conversations would not be productive. JA262. Any mention of Murray's allegations was in the context of noting morale issues among Plaintiff's team members as a result of her acting leadership. JA262–263.[23]

---

[23] The evidence is uncontroverted that Murray never filed an EEO complaint; she made only an informal complaint to HD, which NGA leadership determined was not meritorious. JA262–263.

Finally, regarding the picture of the AR-15, Plaintiff himself testified that he does not believe the discussion about the AR-15 was racially motivated. JA148–149. It was only Cichetti's alleged comment regarding the individuals who had attacked him that Plaintiff asserts was racially motivated. JA149. For the reasons already discussed, however, an inference of animus may not be drawn from that comment as a matter of law. *Supra*, Part I.B.1.b.

## II.    THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFF'S DISCRETE-ACT DISCRIMINATION CLAIM.

The District Court correctly held that Plaintiff's complaint failed to allege a plausible discrete-act race discrimination claim. In its order, the District Court concluded that Plaintiff alleged two adverse employment actions: (1) his performance evaluation; and (2) his removal. JA35. But as to these, Plaintiff had not plausibly alleged "any nexus between the alleged discrimination" and the adverse action. JA35. To the contrary, Plaintiff pled *only* that these two actions were retaliation for protected activity. JA35. Accordingly, the District Court properly held that Plaintiff's discrimination claim was "entirely duplicative of" his retaliation claim and dismissed it. JA35, JA39.

Plaintiff argues that the District Court erred in two respects. *First*, by holding that only his evaluation and removal constituted adverse actions. Pl.'s Br. 16–18. And *second*, by holding that he failed to plead any nexus between the alleged adverse actions and racial discrimination. Pl.'s Br. 15. Neither argument has merit.

46

### A.    Only Plaintiff's Evaluation and Removal Constitute Adverse Employment Actions.

Plaintiff argues that the list of incidents occurring before his performance evaluation and termination—*see supra*, p. 36—also constituted adverse employment actions for purposes of his discrete-act discrimination claim. Pl.'s Br. 14–18. But it is well-established that "not everything that makes an employee unhappy" may be the basis of an employment discrimination claim. *Settle v. Baltimore Cnty.*, 34 F. Supp. 2d 969, 989 (D. Md. 1999), *aff'd*, 203 F.3d 822 (4th Cir. 2000). "An absolute precondition to [any discrimination] suit [is] that some adverse employment action [has] occurred." *Edmonson v. Potter*, 118 F. App'x 726, 728 (4th Cir. 2004) (citation omitted).

What constitutes an adverse employment action has lately been the subject of considerable litigation. Until recently, only "adverse employment actions" that cause "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or . . . a significant change in benefits" were actionable as a Title VII discrimination claim. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (citation omitted). However, the Supreme Court recently held that an individual need only show "show *some* harm respecting an identifiable term or condition of employment"—not that "the harm incurred was 'significant.'" *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024) (emphasis added) (citation omitted). Notably, *Muldrow* was a *private*-sector Title

VII case that interpreted 42 U.S.C. § 2000e–2(a)(1) and considered "significant" harm in the context of whether a plaintiff's transfer to a different unit constituted an adverse action.

The issue here is whether Plaintiff's alleged incidents constitute adverse actions in a *federal*-sector Title VII case under 42 U.S.C. § 2000e-16(a).[24] The difference between the two statutes is by no means a matter of semantics. Under section 2000e-16(a), "[a]ll personnel actions affecting employees" must be "made free from any discrimination based on race, color, religion, sex, or national origin." The key statutory term in section 2000e-16(a)—"personnel actions"—does *not* appear in the private-sector analogue, section 2000e-2.

In *Babb v. Wilkie*, a case under the Age Discrimination in Employment Act, the Supreme Court pointed to the employment actions listed in the Civil Service Reform Act ("CSRA") as the definition of a "personnel action." 589 U.S. 399, 405 (2020); *see* 5 U.S.C. § 2302(a)(2)(A)). Under the well-established principle that "when Congress uses the same language in two statutes having similar purposes . . . it is appropriate to presume that Congress intended that text to have the same

---

[24] This Court has not addressed whether the *Muldrow* standard applies to federal-sector Title VII cases in a published opinion. In *Hansley v. DeJoy*, 2024 WL 4947275, at *2 (4th Cir. Dec. 3, 2024), a Title VII case involving the United States Postal Service, the Court directed the district court to "consider *Muldrow*'s effect on our caselaw." In doing so, however, the Court cited to Title VII's *private*-sector anti-discrimination statute, 42 U.S.C. § 2000e-2. The Court therefore did not address the different standard that may apply to in federal Title VII cases.

meaning in both statutes," *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005), *Babb*'s dicta likely applies equally to Congress's use of "personnel action" in 42 U.S.C. § 2000e-16(a). The CSRA lists the following, *inter alia*, as "personnel actions": (1) an appointment (*i.e.*, hiring decision); (2) a promotion; (3) suspensions "or other disciplinary or corrective action[s]"; (4) a "decision concerning pay, benefits, or awards; and (5) "any other *significant* change in duties, responsibilities, or working conditions." 5 U.S.C. § 2302(a)(2)(A) (emphasis added). Thus, the very language that *Muldrow* found was missing from the private-sector provision— "significant"—appears in the CSRA's definition of "personnel action"—the term used in Title VII's federal-sector provision. Accordingly, the requirement that an adverse action be significant to be actionable still exists for purposes of a federal-section Title VII claim like Plaintiff's. Under *Babb*, therefore, only Plaintiff's performance evaluation and removal are cognizable employment actions.

Even if this Court were to apply the "adverse action" standard articulated in *Muldrow*, however, that would remain true. What holds steady regardless of the standard applied is that an adverse employment action must *somehow* "adversely affect[] the terms, conditions, or benefits of the plaintiff's employment." *James*, 368 F.3d at 375 (cleaned up) (citation omitted). In short, Plaintiff must articulate some harm to his *employment*.

Here, Plaintiff did not allege *any* changes to the terms, conditions, or benefits of his employment that resulted from the incidents he identifies in his complaint—whether that change was significant or otherwise. *See* JA14–17, ¶¶ 23–33. The incidents Plaintiff alleges range from what he perceived to be undeserved criticism and/or oversight to comments that he perceived as discriminatory. While unpleasant or undesirable, these types of events do not, by themselves, constitute actionable discrimination claims. They are more appropriately addressed—as the district court did here—through Plaintiff's hostile work environment claim. *See* JA35–37. After all, a plaintiff may not premise a discrete-act discrimination claim, as Plaintiff tries to do, on "constant comments and negativity." *McKinney v. G4S Gov't Sols., Inc.* 711 F. App'x 130, 135 (4th Cir. 2017).

Taking Plaintiff's argument at face value, any unwanted comment, criticism, or action by an employer could constitute an adverse employment action if it caused the employee *any* injury whatsoever, including simple emotional distress. That is, however, not the standard that applies. The harm must be to the terms or conditions of Plaintiff's employment. Plaintiff's complaint is devoid of any such plausible allegations. Plaintiff merely concludes that the "foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment," JA21, ¶ 50, without providing any details of what terms were affected, or how. Plaintiff also alleges that he was "reprimanded . . . in a way that deprived him of

workplace safety and otherwise adversely affected his status as an employee because of his race." JA21, ¶ 53. Plaintiff's complaint does not explain what he meant by "workplace safety." These types of conclusory allegations do not allow the Court to plausibly infer that Plaintiff suffered any harm to his employment. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Coleman*, 626 F.3d at 191 ("Absent such support, the complaint's allegations of race discrimination do not rise above speculation."). The District Court correctly considered only Plaintiff's evaluation and his removal as adverse employment actions.

### B. Plaintiff Did Not Plead a Nexus Between Any Alleged Adverse Action and Racial Discrimination.

Plaintiff first claims that he properly alleged that his performance evaluation and removal were discriminatory—relying on a single paragraph of his complaint stating that his earlier allegations are "evidence of the consistent discriminatory, harassing, *and retaliatory* treatment" that he faced. JA19, ¶ 40 (emphasis added); *see* Pl.'s Br. 14–15. On its face, this allegation does not recharacterize his previous allegations as discrimination as he suggests; rather, it expressly acknowledges that he had also alleged conduct that was putatively "retaliatory." And as the District Court recognized, Plaintiff's express allegations that challenged actions were retaliatory is an appropriate for dismissal of a discrimination claim. *See Lucas v. VHC Health*, 128 F.4th 213, 221 (4th Cir. 2025) ("Lucas herself insists that she was

terminated in retaliation for complaints about earlier discrimination, not her disability."); JA18, ¶¶ 37, 39.[25]

Plaintiff next claims that he "successfully alleged facts that plausibly present . . . the nexus between the alleged discrimination and all of the adverse discriminatory actions that occurred before the October 2020 year-end performance review and January 2021 termination." Pl.'s Br. 15. He then describes four of those incidents: (1) the criticism of his team at the August 2019 offsite; (2) Gondeck's August 2019 comments regarding Plaintiff's wearing sneakers in the office; (3) the September 2019 meeting with Cichetti involving the AR-15 picture and anecdotal stories; and (4) the October 2019 Halloween party. *Id.* at 16–18.

Left unexplained is how these incidents (let alone the others he alleges but does not expressly discuss) constitute the required nexus. While not entirely clear, Plaintiff seems to suggest that these incidents, *when combined*, together allow an inference of discrimination. But most of the incidents with Plaintiff's supervisors have no apparent connection to race whatsoever.

---

[25] If there were any doubt, Plaintiff confirmed the nature of his allegations in discovery, testifying that his evaluation was "influenced based off of the current EEO case" and his other protected activity, not his race. JA177; *see* JA177–180 (discussing Plaintiff's belief that he received a low rating in part because he refused to lower his team members' ratings). He likewise testified that his removal was based on protected activity. JA193–195.

For instance, regarding the August 2019 offsite meeting, Plaintiff alleged that he heard Gondeck, Cichetti, and others state that they did not know what Plaintiff's team did "outside of working on an excel spreadsheet." JA14–15, ¶ 24. As to how this was racially motivated, Plaintiff alleges only that "all the other divisions were comprised mostly, if not all, [of] Caucasian individuals." JA14. ¶ 24. Likewise, Plaintiff's allegations about Gondeck and Cichetti's criticism of his sneakers contain no reference—overt or otherwise—to race. JA15, ¶ 25. To the contrary, Plaintiff alleged that Gondeck and Cichetti warned him about wearing sneakers to the office because it was unprofessional—a racially neutral and legitimate reason—and later changed the dress code as a result. JA15, ¶ 25, JA17, ¶ 31.[26]

Plaintiff's remaining allegations relate to Gondeck's and Cichetti's concerns about his work performance, management style, and relationships with contractors. JA15–18, ¶¶ 27, 30, 32, 35. Again, Plaintiff does not identify, in connection with any of these allegations, "any derogatory comments about [his] race." *Causey*, 162 F.3d at 801. His bald assertions that the challenged conduct was "based on race," JA11, ¶ 1; *see also* JA19, ¶ 40, are the sort of "naked assertions devoid of further factual enhancement" that are "not entitled to the presumption of truth" on a motion

---

[26] In addressing his hostile work environment claim, Plaintiff claims that Gondeck and Cichetti "targeted" Plaintiff "based on a stereotype that Black men wear sneakers and sneakers are not acceptable in the White workforce." Pl.'s Br. 27–28. No such allegation appears in the complaint (nor is there any record evidence to support such speculation).

to dismiss. *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citation omitted); *see Lucas*, 128 F.4th at 220 ("We are not obligated to credit [plaintiff's] speculations as to why someone said something to her."); *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 585, 584 (4th Cir. 2015).

Combining the incidents that occurred before Plaintiff's evaluation does not somehow transform a series of racially neutral incidents into a plausible inference that the later adverse actions were based on race. In fact, Plaintiff's allegations, taken as a whole, support an entirely different inference—that Plaintiff was rated unacceptable and then removed because of a history of performance and communication issues. *See* JA15–18, ¶¶ 27, 30–32, 37 (describing Gondeck's and Cichetti's concerns about Plaintiff's inability to meet his performance objectives, his negative relationships with contractors, and his unprofessional attire). Plaintiff himself thus presents a plausible and legitimate reason for why he was rated "unacceptable" and removed during his probationary period. *See Bing v. Brivo Sys., LLC*, 959 F.3d 605, 617–18 (4th Cir. 2020) (affirming dismissal of discrimination claim where plaintiff "specifically alleged a non-racial reason for the termination"—his minor involvement in a shooting); *McCleary-Evans*, 780 F.3d at 588 (holding that "obvious alternative explanation" for adverse treatment precluded plaintiff from pleading plausible Title VII claim of discrimination); *see also Tabb v. Bd. of Educ. of Durham Pub. Schs.*, 29 F.4th 148, 156 (4th Cir. 2022) (same).

Accordingly, the District Court did not err in dismissing Plaintiff's claim of discrete-act discrimination.

## CONCLUSION

For these reasons, Defendants respectfully request that the Court affirm the judgment.

Respectfully submitted,

ERIK S. SIEBERT
United States Attorney

_____/s/_____
PETER B. BAUMHART
CAROLYN M. WESNOUSKY
Assistant United States Attorneys
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3738/3996
Fax: (703) 299-3983
Email: Peter.Baumhart@usdoj.gov
    Carolyn.Wesnousky@usdoj.gov

*Attorneys for Defendants-Appellees*

Dated: March 14, 2025

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(A)</u>

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 13,000 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

This brief contains 12,996 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

_____/s/_____
PETER B. BAUMHART
Assistant U.S. Attorney
*Attorney for Defendants-Appellees*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I electronically filed the foregoing with the

Clerk of the United States Court of Appeals for the Fourth Circuit using the CM/ECF

system, which will send a notice of such filing to all registered CM/ECF users.


      /s/

PETER B. BAUMHART
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:   (703) 299-3738
Fax:   (703) 299-3983
Email: Peter.Baumhart@usdoj.gov

*Attorney for Defendants-Appellees*

DATE: March 14, 2025